1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

------------------------------
                              :
UNITED STATES OF AMERICA,     :
                              :
         Plaintiff,           :
                              :
    v.                        :   Civil Action
                              :   No. CV-11-01175 PA
DAVID CHAMPION,               :
                              :
         Defendant.           :
                              :
------------------------------


Telephonic deposition of JAMES IANNITTI, a witness herein, at the offices of U.S. Department of Justice, 555 Fourth Street, N.W., Washington, D.C., commencing at 12:05 p.m. on Thursday, November 17, 2011, and the proceedings being taken down by stenotype and transcribed by Catherine B. Crump, a Notary Public in and for the District of Columbia.

**Page 10**

1 a very lucrative contract, and the owner of the
2 business decided to try and make an example of me so
3 that any of his other independent contractors would
4 not do the same thing.
5    Q.  Where was the case filed?
6    A.  Los Angeles Superior Court, I believe.
7    Q.  It was in State Court?
8    A.  Yes.
9    Q.  What was the nature of the company that
10 you had left? What did that company do?
11    A.  They did airline advertising.
12    Q.  And what had you done for that company?
13    A.  I sold advertising air time, produced
14 commercials, audio commercials and print ads as well
15 that were shown on the airlines.
16    Q.  National airlines?
17    A.  Yes. Delta, American, and United, TWA.
18    Q.  Okay. And what was the result of that
19 lawsuit? What happened in the end?
20    A.  It was dismissed.
21    Q.  And there was -- you weren't found
22 liable then?

**Page 11**

1    A.  No.
2    Q.  Did you settle the case?
3    A.  No. It was just dismissed.
4    Q.  The plaintiff stopped prosecuting the
5 case?
6    A.  Yes.
7    Q.  Now, other than that, have you been a
8 party in any other lawsuits?
9    A.  I don't remember being a party in any
10 other lawsuit, no.
11    Q.  Now, you presently live in Portland,
12 Oregon; is that correct?
13    A.  Yes.
14    Q.  How long have you lived there?
15    A.  Since July of 2009.
16    Q.  And where did you live in the preceding
17 five years before that?
18    A.  That would be in Santa Clarita,
19 California.
20    Q.  Where is Santa Clarita located in
21 California?
22    A.  That's the northern part of Los Angeles

**Page 12**

1 County, just above the San Fernando Valley.
2    Q.  Have you ever been arrested?
3    A.  No.
4    Q.  Have you ever been charged with a crime?
5    A.  No.
6    Q.  Now, you identified a company that you
7 worked for that you were in litigation with, right,
8 and you were working as an independent contractor for
9 them?
10    A.  Yes.
11    Q.  Tell me your job history since that
12 time. What have you done?
13       That was in 1999 that you left that company.
14 Give me an overview of your job history from that
15 date forward.
16    A.  Well, from that date forward, I found
17 that one of the airlines', Delta Airlines', contract
18 was coming up for renewal. So I bid on the contract
19 and landed it, which prompted the lawsuit. The
20 business ran very well. I ran the business with
21 another -- with the help of another person, and it
22 was very successful until 9-11.

**Page 13**

1       When 9-11 happened, nobody wanted to advertise
2 on a missile. So it basically put us out of
3 business. We were unable to continue purchasing the
4 air time from the airlines and had to close up shop.
5       At that point, I went into business. Let's
6 see. I went into promotions. I took my client base
7 and tried to get -- create promotional campaigns for
8 businesses. That was very difficult. It didn't pan
9 out, and then when I was selling promotional items, I
10 ran into a business that sold equipment financing and
11 leasing to businesses. The owner of the company
12 liked me and asked me if I would be interested in
13 selling to businesses, and I said yes, and that's how
14 I got into the business that I'm in now. I was
15 always working for myself and I've been doing so
16 since.
17    Q.  Now, what's your present occupation or
18 your present employer?
19    A.  My present occupation is I work for
20 myself and I sell equipment leasing and financing.
21    Q.  Do you have a name of a company that you
22 operate under?

## Page 14

1  A.  I'm a sole proprietor. So I work under
2  my name. That's pretty much it. I market myself
3  through various bank lines like Southern California
4  Leasing, which is my customer. So their name appears
5  on some of the documents and stuff. So I'm getting
6  brand recognition through that.
7    Q.  This has been your occupation for maybe
8  seven or eight years. Does that sound about right?
9    A.  Since 2004.
10   Q.  Okay. Briefly tell me what does your
11 job entail specifically. What do you do?
12   A.  I call businesses and equipment dealers.
13 With the equipment dealers, I want to talk to them
14 about helping their customers get financing for
15 equipment that they can't afford to pay cash for.
16 When I call customers, it's looking to see if they
17 are going to acquire equipment in the next 60 to 90
18 days, and if they are, I get them preapproved so that
19 they can go out and buy the equipment they need from
20 any equipment dealer in the country.
21   Q.  So you bring two different people
22 together, effectively?

## Page 15

1  A.  Yes.
2    Q.  With your sort of the expertise of the
3  finance side and of the equipment side?
4    A.  Yes.
5    Q.  Okay. And you said you were a sole
6  proprietorship?
7    A.  Yes.
8    Q.  Have you formally incorporated or done
9  anything in any State to make your business status
10 official?
11   A.  No. I talked with my accountant about
12 it and they recommended I stay a sole proprietor.
13   Q.  Have you always been that since you
14 started this business?
15   A.  No. I started out with the business
16 trust, Intermax Holdings.
17   Q.  Okay. We'll talk about that shortly,
18 but you don't operate under that trust anymore; is
19 that fair to say?
20   A.  Yes.
21   Q.  Do you have any partners?
22   A.  No.

## Page 16

1    Q.  Any employers?
2    A.  No.
3    Q.  Now, are you familiar with an individual
4  by the name of David Champion?
5    A.  Yes.
6    Q.  Describe when you first met him and how
7  you became familiar with him.
8    A.  I first met Dave Champion in the early
9  1990s. I met him at Golds Gym.
10   Q.  Where? Where was the gym located?
11   A.  Santa Clarita.
12   Q.  Were you both working out at this gym?
13   A.  Yes.
14   Q.  So you just happened to meet him through
15 the course of your workout?
16   A.  Yes.
17   Q.  Did he become a friend of yours?
18   A.  Yes. Yes.
19   Q.  Did you ever socialize with him?
20   A.  Oh, yeah, all the time.
21   Q.  What would you do? Go out to dinner?
22 Have drinks?

## Page 17

1    A.  In the beginning, over the first couple
2  of years, it was mostly just in the gym.
3    Q.  And then did it expand beyond that?
4    A.  Yes.
5    Q.  Did he live near you?
6    A.  At that time, yes.
7    Q.  Did you know where he lived
8  specifically?
9    A.  At that time?
10   Q.  Yeah. Like what city? In what city did
11 he live in at the time?
12   A.  He lived in Solyas.
13   Q.  Solyas, California?
14   A.  Yes.
15   Q.  Okay. Now, did there ever come a time
16 when you started to talk to Mr. Champion about
17 federal income tax matters?
18   A.  Yes.
19   Q.  Tell me about that.
20   A.  Do you have a more specific question? I
21 mean, there's a lot to say.
22   Q.  When did you first have any discussions

                                    18
1   with him about the federal income tax issues? What
2   year? What month?
3       A.   I don't know the exact year, but it was
4   right around the time he was having a tax issue of
5   his own with the IRS.
6       Q.   And so he did he raise the topic with
7   you?
8       A.   Yeah. Yeah. When we were in the gym,
9   he spoke about it.
10      Q.   And do you remember anything he told
11  you?
12      A.   Yeah. He had said that the IRS had --
13  he had a dispute with them and they had come to his
14  home and taken just about everything out of his
15  house.
16      Q.   Did he express unhappiness with that?
17      A.   Yeah.
18      Q.   And these conversations about his
19  problems with the IRS, they occurred sometime in the
20  1990s, you think?
21      A.   Yes.
22      Q.   Okay. Now, did there ever come a time

                                    19
1   when you had conversations with Mr. Champion about
2   things he might do for you?
3       A.   Well --
4       Q.   In terms of federal income tax matters.
5       A.   Oh, okay. Yes.
6       Q.   Tell me about when that happened and
7   what the context was in which those discussions
8   occurred.
9       A.   I would say when they started the trust,
10  it was about a year prior to that that we had started
11  talking about what he could do as far as setting up a
12  business trust for me.
13      Q.   Did you raise the issue with him or did
14  he raise the issue with you?
15      A.   I think it was an ongoing issue with
16  what happened to him. So it just kind of grew from
17  there.
18      Q.   What did you understand had happened to
19  him beyond what you just testified to? You said that
20  the IRS had taken some of his personal holdings or
21  effects, but what more than that did you understand
22  had happened to him?

                                    20
1       A.   I don't know what the nature of the
2   dispute was. I don't remember. It was some big
3   taxation thing and he did some research and believed
4   that the IRS had illegally taken his stuff and he was
5   filing a lawsuit, and I don't know what that
6   entailed.
7       Q.   Did he discuss with you how a trust, a
8   business trust, would impact what had happened to him
9   or would have impacted?
10      A.   No.
11      Q.   Did you ask him about the possibility of
12  the creation of a business trust for yourself?
13      A.   I can't remember if -- I don't know how
14  it evolved into him doing a business trust. I just
15  can't remember.
16      Q.   So you don't know who raised the issue
17  first?
18      A.   Oh, well, I had no idea what a business
19  trust even was before I met Champion. So, I mean,
20  the idea of a business trust had to come from him.
21      Q.   You just don't remember the more
22  specific details about the conversation in which it

                                    21
1   was first breached?
2       A.   I just don't remember how it was first
3   brought up.
4       Q.   What about the concept of being a
5   non-taxpayer? Do you know what that refers to?
6       A.   That's a legal term that I don't know
7   what that means.
8       Q.   Had you ever heard that term before you
9   met David Champion?
10      A.   No.
11      Q.   Do you ever remember him mentioning that
12  term to you?
13      A.   Yes.
14      Q.   Do you remember the context in which he
15  mentioned that term? The time?
16      A.   Can you clarify that a little? I'm not
17  sure I understand.
18      Q.   Do you remember when you first heard Mr.
19  Champion use the term "non-taxpayer"?
20      A.   Not specifically, no.
21      Q.   Do you remember if he had used the term
22  before you started talking about the concept of a

Page 22

1  business trust with him?
2      A.  I don't recall.
3      Q.  Do you have any understanding as you sit
4  here today of what the term refers to?
5      A.  Not really. I mean, I've heard the term
6  and I kind of have an idea that I guess it means
7  somebody not paying taxes, but I don't know anything
8  as far as like the legal aspects of it.
9      Q.  Well, do you ever remember having any
10 discussions with Mr. Champion in which he represented
11 to you that there were certain kinds of U.S. citizens
12 to whom federal income laws did not apply?
13     A.  Yes. That, I remember.
14     Q.  Okay. Tell me about the context in
15 which those discussions occurred.
16     A.  You know, it was just an intertwining
17 theme through a lot of conversations. I mean, could
18 you be more specific as to what you're looking for?
19     Q.  Well, do you have any sense as you sit
20 here today when you first heard Mr. Champion tell you
21 that there might be, in his view, a group of citizens
22 to whom the federal tax laws did not apply?

Page 23

1      A.  When he first mentioned that to me?
2      Q.  Yeah.
3      A.  I want to say it was right around the
4  time we created the trust, Intermax Holdings.
5      Q.  Let's mark a document. Maybe this will
6  help you in recalling things. I have forwarded to
7  you a set of materials over the internet, some PDF
8  documents. Do you have those before you?
9      A.  Yes, I do.
10     Q.  I'd like you to look at the one -- it
11 should be the first document, I think. It's a trust
12 indenture. It refers to Intermax Holdings. It's a
13 three-page document.
14     A.  Okay. I've got it.
15     MR. CORCORAN: Okay. I'm going to mark that
16 as Iannitti Exhibit 1.
17           [Iannitti Exhibit No. 1 was
18           marked for identification.]
19 BY MR. CORCORAN:
20     Q.  Do you have it before you?
21     A.  Yes, I do.
22     Q.  Have you ever seen this before?

Page 24

1      A.  Yes.
2      Q.  What is it?
3      A.  It's the trust agreement that Champion
4  created for the business trust organization.
5      Q.  Look on the third page of the document.
6  Is that your signature?
7      A.  Yes, it is.
8      Q.  And the second page of the document, it
9  says it was signed by you as managing agent on July
10 26, 2002; is that about right?
11     A.  Yes.
12     Q.  Now, you recall having discussions with
13 Champion sometime in 2002 about the idea that some
14 citizens aren't covered by the United States income
15 tax laws?
16     A.  Yes.
17     Q.  What were the nature of those
18 conversations? Do you remember any of the kinds of
19 things he told you about that?
20     A.  I mean, I'd know it if I heard it, but
21 it's hard to repeat it.
22     Q.  But you do remember the concept being

Page 25

1  breached by him?
2      A.  Yeah. Yeah, absolutely. I mean, I had
3  no idea of any of this stuff. This is all a product
4  of his research.
5      Q.  And you didn't tell him that was your
6  view. Right?
7      A.  What do you mean?
8      Q.  Well, did you raise the issue with him
9  first?
10     A.  Oh, no.
11     Q.  Had you ever even thought that that
12 might be the case?
13     A.  No. No. You know, I was perfectly
14 happy filing tax returns every year. So I never
15 dreamed of doing this.
16     Q.  Prior to 2002, had you filed a Form
17 1040, Individual Income Tax Return ever?
18     A.  Yes, every year.
19     Q.  Did Champion persuade you that, in fact,
20 you didn't have to file a Form 1040, Income Tax
21 Return?
22     A.  You know, I relied on his expertise to

26

1  make this -- to do this. You know, he held himself
2  out to be an expert in taxation. So I followed his
3  advice.
4      Q. What did you understand the basis of his
5  expertise to be?
6      A. That if I conducted business under a
7  pure trust, the income earned through that trust
8  would be non -- would not have a tax reporting
9  requirement.
10     Q. That was what he told you?
11     A. Yes.
12     Q. But what was the basis -- what did you
13  understand the basis for his expertise was? How did
14  he become an expert? Why was he an expert?
15     A. Oh, well, I mean, based on all of his
16  research and what he was -- you know, he was telling
17  me about all of his research and he showed me the tax
18  law and asked me, you know, specific questions when
19  referring to the tax law.
20     Q. What was the result of the questions?
21  What was the conclusion you reached after he asked
22  you those questions?

27

1      A. Well, the questions were -- you know, he
2  read things that -- out of the Tax Code that said if
3  you're a resident alien, you should be required to
4  file a 1040; is that you, he asked me, and I said no.
5  Then he proceeded like to three of them. He said is
6  that you? I said no. He said in the next one, is
7  that you, and I said no. He said then the Tax Code
8  doesn't apply to you.
9      Q. That meant that you didn't have to file
10  a 1040, Income Tax Return?
11     A. Yes.
12     Q. And you were persuaded by his analysis?
13     A. Yes. It was very convincing.
14     Q. And he's a convincing person?
15     A. Yes.
16     Q. Now, when you had these discussions with
17  him, where were you having them? At the gym?
18     A. Most of them were at the gym.
19     Q. Did you ever have any discussions at
20  your house?
21     A. His house. I think we went to his house
22  a couple of times.

28

1      Q. And you talked about tax matters with
2  him?
3      A. Yeah.
4      Q. Now, did there ultimately come a time
5  when you decided you were going to pay him to assist
6  you with your business and with some tax-related
7  matters?
8      A. Yes. When he created the trust, that
9  was about the time we started that.
10     Q. That was the first time you ever paid
11  him for any of his advice or assistance?
12     A. Yes.
13     Q. Do you remember how much you paid him to
14  create the trust, the example of which is the
15  document before you, the Intermax Holdings Trust?
16     A. I believe it was somewhere between two
17  and three thousand.
18     Q. Two and three thousand dollars?
19     A. Yes.
20     Q. In what form did you pay him?
21     A. Cash.
22     Q. Did he ask you to pay him in cash?

29

1      A. Yes.
2      Q. Why did he want the payment to be in
3  cash?
4      A. Because he didn't have a bank account.
5      Q. He told you he didn't have a bank
6  account?
7      A. Yes.
8      Q. Did he say why he didn't have a bank
9  account?
10     A. He said that he didn't have a bank
11  account because he didn't want the IRS knowing his
12  business.
13     Q. He didn't want the IRS to know how much
14  money he had?
15     A. Knowing his business is basically what
16  he said.
17     Q. What did you understand that to mean?
18     A. Well, I understood that as he didn't
19  want the IRS to know how much money he was making or
20  to possibly even confiscate it.
21     Q. Now, at the time that -- let's look at
22  Exhibit No. 1 in a little more detail. He created

**Page 30**

1   this document for you; is that right?
2       A.   Yes.
3       Q.   He presented it to you and said you're
4   going to sign this; here you go?
5       A.   Yes.
6       Q.   Why did you want to create this
7   document, this Intermax Holdings Trust? What was the
8   purpose of creating this trust?
9       A.   The tax benefits.
10      Q.   What were the tax benefits to be?
11      A.   There was no reporting requirement.
12  There was no tax. You didn't have to pay tax on the
13  money that was generated through the business trust.
14      Q.   What was the trust -- what specifically
15  was the trust going to do once it existed? How were
16  you going to use it?
17      A.   For business. My customers would pay
18  the trust and the money would go through that.
19      Q.   So they wouldn't write a check to you if
20  you did your equipment leasing job for them; they
21  would write a check to Intermax Holdings?
22      A.   Yes.

**Page 31**

1       Q.   And Intermax Holdings, your
2   understanding was, did not have to file a tax return?
3       A.   Yes.
4       Q.   And as a result of that, you wouldn't
5   have to pay income tax on its profit?
6       A.   Exactly.
7       Q.   Now, look at the second page of the
8   document. Your signature line says you're the
9   managing agent. What did you understand the managing
10  agent of the trust to be?
11      A.   The managing agent handles the
12  day-to-day business operations of the trust much like
13  a manager in a store, and that was it. I was not
14  able to do -- anything that would compromise the
15  integrity of the trust would have to be dealt with by
16  the trustee.
17      Q.   And that was Mr. Champion?
18      A.   Yes.
19      Q.   But you would still manage the business
20  completely. Right?
21      A.   Yes.
22      Q.   Did he have any management authority

**Page 32**

1   over the business, Mr. Champion?
2       A.   No.
3       Q.   And, in fact, during the time that this
4   trust existed, you continued to manage the business
5   on a day-to-day basis?
6       A.   Yes. Yes.
7       Q.   You didn't relinquish any authority over
8   the business to Mr. Champion?
9       A.   No.
10      Q.   Did he make any business decisions for
11  you while the trust existed?
12      A.   No.
13      Q.   Now, it's true that the trust no longer
14  exists. Right?
15      A.   Yes.
16      Q.   Now, at the time that this document was
17  created and you created this trust, did you
18  understand that Mr. Champion was providing advice to
19  other individuals like yourself?
20      A.   Yes.
21      Q.   Did he ever talk to you about that?
22      A.   About providing this service to other

**Page 33**

1   clients?
2       Q.   Yes.
3       A.   Yes.
4       Q.   What did he tell you?
5       A.   That he had a lot of clients and they
6   were doing very well.
7       Q.   Did he tell you that he had formed
8   trusts like this for other clients?
9       A.   Yes.
10      Q.   Did he have any websites at this point,
11  to your knowledge?
12      A.   At the beginning when he created the
13  trust?
14      Q.   Yes.
15      A.   I don't believe he did. I just can't
16  remember.
17      Q.   Did there ever come a time later on when
18  you were aware of a website that he had created that
19  related to his business?
20      A.   Yes.
21      Q.   What was the name of that website, if
22  you know?

**Page 34**

1   A.  I think it was originalintent.org or dot
2   -- yeah, dot org or dot com or something.
3   Q.  Have you ever heard of website called
4   nonpayer.org?
5   A.  Yes. Yes. I believe that was one of
6   his as well.
7   Q.  Do you remember when you first heard
8   about that website?
9   A.  Oh, no. I just -- it was mentioned in
10  casual conversation, but I don't remember
11  specifically when.
12  Q.  Were you ever asked by Mr. Champion to
13  provide him with a testimonial of the services he
14  provided you and post that on the website?
15  A.  Oh, yes. I do remember that.
16  Q.  Did you do that for him?
17  A.  He wrote it and -- he wrote something
18  and sent it to me and said would it be okay to put
19  this on my website. It didn't have my last name. It
20  just had my first name on it. I said that would be
21  fine, I guess.
22  Q.  Did it say Jim I.?

**Page 35**

1   A.  Yeah. I remember that, yeah.
2   Q.  So he showed it to you and said is this
3   fine and you approved it?
4   A.  Yes.
5   Q.  Now, after you formed Intermax Holdings,
6   did there come a time when you stopped filing 1040,
7   Individual Income Tax Returns?
8   A.  I believe that was in 2005.
9   Q.  That was the first year you didn't file
10  one?
11  A.  Yes.
12  Q.  Why did you decide not to file a return
13  that year?
14  A.  That was the year that I decided that --
15  I didn't know the trust was created years earlier. I
16  never really utilized it because I really wasn't
17  making a whole lot of money. I was really
18  struggling, and in 2005, I started to get my footing
19  and business started to get better. So I figured I
20  might as well take advantage of the business trust
21  tax benefits and stop filing a 1040.
22  Q.  So that was the -- was your decision at

**Page 36**

1   all based upon advice Mr. Champion had given you?
2   A.  Yes.
3   Q.  You were relying on advice he had given
4   you?
5   A.  Yes.
6   Q.  How many years did you not file a form
7   1040?
8   A.  2005, '6, and '7.
9   Q.  Have you filed returns for those years
10  since then?
11  A.  Oh, yes.
12  Q.  And you filed 1040s in the years since
13  as well?
14  A.  Yes.
15  Q.  Now, at the time that you decided not to
16  file a return, did you consider yourself a
17  non-taxpayer?
18  A.  That's a legal term that I'm not really
19  qualified to answer.
20  Q.  Well, did you believe that you weren't
21  obligated to file a 1040 at that point?
22  A.  Yes.

**Page 37**

1   Q.  That was a concept you had learned from
2   Mr. Champion?
3   A.  Yes.
4   Q.  Now, you said you paid Mr. Champion for
5   the services he provided in creating that trust
6   indenture that we just looked at. Did you pay him
7   for any other services he provided you?
8   A.  Yes.
9   Q.  What other services besides drafting
10  this document did he provide you?
11  A.  When I started receiving letters from
12  Agent Cheung requesting my 1040s, I forwarded those
13  letters to Mr. Champion, and he -- well, no. Wait a
14  minute. Before that, it was a request for a 1099
15  from one of my customers. I forwarded that to Mr.
16  Champion because he was the trustee and he was
17  supposed to handle all tax matters.
18      So I forwarded the request for a 1040 [sic] to
19  him and he provided a response to my customer and
20  billed me for that.
21  Q.  Okay. So he drafted a letter to one of
22  your customers. What else did he do for you?

Page 38

1   A.   Then it was the letters from Agent
2   Cheung, which he provided the basis for the
3   responses, the letters, which I toned down a bit. I
4   didn't want to -- he was a little more abrasive than
5   I wanted to be. So I toned them down a little and
6   forwarded them on to the IRS, but he billed me for
7   that.
8   Q.   Okay. What else?
9   A.   I think it was -- let me see. What
10  else?
11       Oh, there was some letters from the bank,
12  summons from the IRS that were requesting my bank
13  records from my bank, and he prepared letters to send
14  to the banks requesting they not release my
15  information, and he billed me for that.
16  Q.   Okay. What else?
17  A.   And he charged an annual fee, trustee
18  fee, of some kind.
19  Q.   Do you remember what that fee was?
20  A.   I'm going to say it was 1200, but I
21  can't be certain.
22  Q.   How many years do you recall paying that

Page 39

1   fee to him?
2   A.   Because I didn't really have the money
3   and I really wasn't using the trust, so it kind of
4   was dormant in its first few years. So I want to say
5   in 2005, I started paying that.
6   Q.   And then how many years thereafter did
7   you pay it?
8   A.   '5, '6, and '7.
9   Q.   Just for three years?
10  A.   Yes, to the best of my knowledge.
11  Q.   Did he ever give you any business advice
12  about how to run your equipment leasing business?
13  A.   No. No. Only if it involved
14  compromising the integrity of the trust.
15  Q.   And tax matters, would they constitute a
16  potential compromising the integrity of the trust?
17  A.   Yes.
18  Q.   And did he do anything else for you
19  besides what you've testified about so far?
20  A.   I think that's it in my business world.
21  Q.   How much in total do you recall paying
22  him for all the tax-related services he provided you?

Page 40

1   A.   I want to say it was around 5,000. It's
2   hard to say exactly because it was in cash and I
3   didn't like hand him the trustee fee $1200 every year
4   or I would have remembered that. I paid him in
5   partial payments throughout the years. You know, it
6   being in cash, I never got any receipts or anything.
7   So it's hard to say.
8   Q.   Did he ever submit invoices to you?
9   A.   I did get a few.
10  Q.   But the format that he requested that
11  you pay him in was cash?
12  A.   Yes. It was always cash.
13  Q.   And you used his services starting in
14  2002 and ending when?
15  A.   I would say it was the day I was served
16  with papers to appear before a judge with my books
17  and records.
18  Q.   When was that?
19  A.   I don't remember that exact date, but
20  Agent Cheung was at my office. He probably recalls
21  that day.
22  Q.   Can you remember the year?

Page 41

1   A.   2009 maybe. I would say early 2009.
2   Q.   So you paid him for services between
3   2002 and around 2009?
4   A.   Yes.
5   Q.   Did Mr. Champion ever give you any
6   advice about income you earned and the way it should
7   be reported?
8   A.   I'm not sure I understand the question.
9   Q.   Did he ever give you any advice at all
10  about what kinds of reporting should be associated
11  with the monies you earned from your business
12  activities?
13  A.   I'm not sure I understand the question,
14  but I think the standing theme through everything was
15  that it was not report -- anything I generated
16  through the business trust was not reportable.
17  Q.   In any regard?
18  A.   In any regard.
19  Q.   Let me ask you this: Let me ask you a
20  more specific question that might help get where I'm
21  trying to go. Did you ever receive from any of your
22  customers a Form 1099?

Page 46

1  you know, if you filled out the tax return with the
2  money on it, with the amount of income on it, not
3  only would it make the money taxable, but it would
4  also, you know, give them the amount of money that
5  was taxable.
6      Q.   And why didn't you want to tell the IRS
7  that?
8      A.   It wasn't that I didn't want to tell
9  them. It was that I didn't want to make it taxable.
10     Q.   Oh, so by disclosing it, your
11 understanding was you suddenly made it taxable?
12     A.   Yes.
13     Q.   Did any of this, what you were doing --
14 remember, Mr. Iannitti, I'm just trying to get your
15 understanding of it, what you understood -- the
16 rationale for what you were doing.
17     Did any of this have anything to do with the
18 idea that the IRS did not agree with the concept that
19 the trust didn't have a tax obligation?
20     A.   I don't know if the trust -- if the IRS
21 did not agree. I specifically asked questions in my
22 correspondence with Agent Cheung, but I know I

Page 47

1  received -- at that time, I didn't receive a clear
2  answer. So I didn't know if it was relevant or not.
3      Q.   Well, did Mr. Champion ever tell you
4  that the government or the IRS specifically did not
5  understand that certain kinds of people or certain
6  kinds of organizations were not subject to the income
7  tax?
8      A.   Not that the government didn't
9  understand. I think it was more about that if the
10 IRS found out you were doing this, they would put
11 pressure on you to become -- to come back into the
12 system to become -- to start paying taxes on this
13 money.
14     Q.   So even though -- well, let me strike
15 that.
16     It was your fundamental understanding that you
17 didn't have this tax obligation. Right?
18     A.   Right.
19     Q.   But what you're saying is you understood
20 also that even though that was the case, the IRS
21 would try to get you to agree that you had a tax
22 obligation somehow?

Page 48

1      A.   Yes.
2      Q.   And so it was important not to put
3  yourself in a position where you would be disclosing
4  information to them that would get them wanting to
5  put that kind of pressure on you?
6      A.   Yes.
7      Q.   Now I want to mark another document. It
8  is a -- so it's in your pile. I think it should be
9  the first E-mail that you come across. The subject
10 matter at the top says Response for Taxpayer ID
11 Number. Do you see it?
12     A.   I'm looking.
13     Q.   Take your time. If I were sitting there
14 in front of you, I would see you looking.
15     A.   I'm looking through. Yes. I've got it.
16 It's an E-mail. Right?
17     MR. CORCORAN: That's it, and we'll mark this
18 as Iannitti 2.
19         [Iannitti Exhibit No. 2 was
20         marked for identification.]
21 BY MR. CORCORAN:
22     Q.   For the record, I'll note that this is

Page 49

1  an E-mail dated July 12, 2005 from Dave Champion to
2  JimI@SBCGlobal.net. That's your E-mail account, Mr.
3  Iannitti?
4      A.   Yes.
5      Q.   Do you recall seeing this E-mail before?
6      A.   Yes. I remember it.
7      Q.   Tell me what this E-mail reflects, if
8  you recall.
9      A.   I had received a request from my
10 customer for a taxpayer ID number for them to send in
11 a 1099, and I called Dave's office and spoke with
12 Sarah, and she said to -- I might have spoken to
13 Dave. I don't remember who I spoke with, and -- I
14 think it was Dave, and he recommended I send a letter
15 to Sarah with the information, you know, so that the
16 trustee could respond appropriately to the request.
17     Q.   Who is Sarah?
18     A.   That was a gal that worked in his office
19 at the time.
20     Q.   Where was his office?
21     A.   He's had a couple of them, but I think
22 it was in Palmdale.

### 50

1  Q. Palmdale, California?
2  A. Yeah.
3  Q. How many people worked in his office, if
4  you know? Did you ever have to go there?
5  A. I did go to his office once. It was
6  after hours and nobody was there, but I don't
7  remember. I know he's had at least one person
8  working in his office at any given time, but I don't
9  know their -- I would know their first names, but I
10 don't remember their last names.
11 Q. Do you know what business he was
12 operating from his office?
13 A. I understood it to be the office of Dave
14 Champion. It was his office for his trustee
15 services, I guess.
16 Q. What business did you understand Mr.
17 Champion to be engaged in when you first met him at
18 the gym?
19 A. He sold phone systems.
20 Q. Phone systems?
21 A. Yeah. He sold and installed phone
22 systems for businesses. As a matter of fact, I

### 51

1  purchased one from him for my business.
2  Q. And that's what he told you he did for a
3  living?
4  A. Yes.
5  Q. But in the course of getting to know
6  him, eventually, he also informed you that he had
7  this trust and tax-related business as well?
8  A. Yes.
9  Q. Do you know at the time of this E-mail,
10 was Mr. Champion still operating his phone business?
11 A. No. No. That was gone.
12 Q. He had stopped doing that? Now,
13 Southern California leasing, was that your customer?
14 A. Yes.
15 Q. And you had done work for them?
16 A. Yes. I still do.
17 Q. So they're still a customer today?
18 A. Yes.
19 Q. And they wanted to issue you a 1099 in
20 connection with compensation they owed you?
21 A. Yes.
22 Q. So that was the reason that they wanted

### 52

1  a taxpayer ID?
2  A. Yes.
3  Q. What response did Champion have to this
4  E-mail? What did he tell you?
5  A. He sent them a letter saying something
6  about -- let me see here. He sent them a letter
7  saying that a business trust organization has no tax
8  reporting requirement.
9     MR. CORCORAN: All right. Let's mark that
10 letter. It should be the next document in the
11 materials that I sent you.
12           [Iannitti Exhibit No. 3 was
13           marked for identification.]
14 BY MR. CORCORAN:
15 Q. We've just marked Iannitti 3. It is a
16 letter dated January 12, 2006 to Barbara Griffith,
17 president of Southern California Leasing, from the
18 office of David Champion. Do you see that document
19 Mr. Iannitti?
20 A. I think so, yes.
21 Q. Have you ever seen this letter before?
22 A. No. No. I was not in on the

### 53

1  information exchange from Dave Champion and Southern
2  California Leasing. That was the trustee's job to
3  handle all of that.
4     So I was apprised of the outcome from both
5  parties, from Champion and from Barbara Griffith,
6  neither of which were happy dealing with each other.
7  Q. You knew he was going to send some sort
8  of letter; is that fair to say?
9  A. Yes.
10 Q. Did you pay him to send the letter?
11 A. Yes.
12 Q. Do you recall how much?
13 A. No. I don't know. Probably between one
14 and $250, somewhere in there.
15 Q. And you knew he had sent a letter; you
16 just didn't get a copy of it?
17 A. Yeah. I never got any copy of any
18 correspondence between the trustee and my customer.
19 Q. But you knew he was going to send a
20 letter that told Southern California Leasing that any
21 1099 they issued shouldn't have your taxpayer
22 identification number on it?

**Page 58**

Q. Okay. Now, if you look at this letter, look at the second to the last paragraph on the first page, which says: "I have dealt with the IRS for nearly 15 years now."

A. Yes.

Q. "I have met with Tom Cheung and his former partner, Helen Tran, on several occasions." Do you see that?

A. Yes.

Q. Why was he referencing Tom Cheung in this letter? Do you know?

A. I have no idea.

Q. Had you heard of Tom Cheung at this point in 2007?

A. It sounds -- it's hard to say if I was getting letters from Tom at this point, but if I was not getting letters, the only -- I remember Dave saying something about the agent and he did say that his agent was Thomas Cheung. So the name was vaguely familiar to me at this point.

Q. Okay. We'll go into this in more detail in a second, but let me ask you a different question.

**Page 59**

Did you ever get any advice from Mr. Champion about the bank account you used for Intermax?

A. Can you be more specific?

Q. Did he ever suggest that you open a bank account with a particular entity or organization?

A. Champion's theory was no bank account.

Q. You shouldn't have --

A. If you had to have one, he recommended Genesis Accounting Concepts, and when they went out of business or closed down, he recommended My Isis.

Q. Why did he recommend Genesis Accounting Concepts?

A. It was a way to stay under the radar of the IRS. In other words, the funds went into the account. They were an accounting service where they would pay your bills out of an account and then send you back the balance so you would have less money going through your personal bank account.

Q. And you say under the radar. Under the radar from whom? Who were you trying to avoid getting on their radar?

A. Not avoid, but just to stay -- it was

**Page 60**

the IRS.

Q. You were trying not to be within the IRS's scrutiny?

A. Yes.

Q. And so how would opening a bank account with Genesis and an account with Genesis Accounting Concepts assist you in that, to your knowledge, if you know?

A. What's that?

Q. How would it assist you? How would it help you get that accomplished?

A. It was about keeping the trust, the business trust, account separate from my personal account, and no -- that was the place he recommended to do this. In other words, I shouldn't go into a bank and open up a bank account under the trust's name.

Q. Because that might result in reporting to the IRS?

A. I don't know if it was reporting, or just because it didn't have a taxpayer identification number, it was difficult to open up a bank account.

**Page 61**

Q. Did you ever hear the term "warehouse bank account" used in connection with Genesis Accounting Concepts?

A. Warehouse? No.

Q. You never heard that term before?

A. No.

Q. But it's your testimony that Mr. Champion specifically recommended you open an account with Genesis Accounting Concepts?

A. Yes. I had no idea who Genesis Accounting Concepts was until he brought it to my attention.

Q. You said the company went out of business?

A. They just closed up. I don't know what happened to them.

Q. Did you lose any money as a result?

A. No. I didn't lose any money at that point.

Q. Now, after they closed, did you open an account with a similar organization? You said My ISIS.

**Page 66**

1  from you. You're Jim. Right?
2  A. Yes.
3  Q. To nontaxpayer.org, and the top is a
4  response from Champion at nontaxpayer.org to you,
5  Jim.
6  A. Yea.
7  Q. Do you see where it says "Dave, just had
8  an idea"?
9  A. Um-hum.
10 Q. It says: "Just had an idea for the
11 response you are preparing to Cheung."
12 A. Yes.
13 Q. Had you heard of Tom Cheung by September
14 12, 2007?
15 A. Yes.
16 Q. Does this refresh your recollection when
17 you might have heard from him first?
18 A. I can't give an exact date, but I
19 started receiving letters from him just prior to
20 that.
21 Q. Sometime in 2007, you heard from him?
22 A. Yeah.

**Page 67**

1  Q. Had you received any correspondence from
2  the IRS asking you to produce documents to them?
3  A. I believe that Thomas Cheung was
4  requesting those just prior to this September 12th
5  correspondence.
6  Q. Now, were you asking Mr. Champion to
7  respond to the letter from Mr. Cheung?
8  A. Yes.
9  Q. Why did you want him to do that?
10 A. Because Mr. Cheung was asking for my tax
11 returns, and according to Champion, I didn't have any
12 taxable income. So I didn't know how to respond. So
13 I asked Champion to respond to that for me.
14 Q. Was this something that was part of his
15 trustee obligations to Intermax, or was this --
16 A. I think it was outside of the scope of
17 the trustee fee. So this was billed separately.
18 Q. It was something you were going to have
19 to pay for separately?
20 A. Yes.
21 Q. And the top E-mail is a response that
22 Champion made to you?

**Page 68**

1  A. Yes.
2  Q. Does this reflect the kind of advice he
3  gave you during your course of conduct with him?
4  A. Yes.
5  Q. Did you get a lot of E-mails from him
6  where he gave you advice?
7  A. No. No. Most of it was done over the
8  phone or over lunch.
9  Q. But this is the kind of advice he would
10 give you?
11 A. Yes.
12 Q. Now let's look at the next document.
13 It's three pages, actually. It's an E-mail from
14 nontaxpayer.org to Jim Iannitti dated September 12,
15 2007, and then attached to it is a two-page letter
16 also dated September 12, 2007. Do you see this
17 document, Mr. Iannitti?
18 A. Yes, I do.
19 MR. CORCORAN: This is going to be Iannitti 7.
20     [Iannitti Exhibit No. 7 was
21     marked for identification.]
22 BY MR. CORCORAN:

**Page 69**

1  Q. Have you ever seen this before?
2  A. Yes.
3  Q. What is it?
4  A. It's the response that Dave Champion
5  prepared for me to send to Thomas Cheung.
6  Q. He drafted this for you?
7  A. Yes.
8  Q. Did you end up actually sending a letter
9  like this to Thomas Cheung?
10 A. Yes.
11 Q. Did you revise it in any way?
12 A. I think I may have toned it down a
13 little. You know, I didn't make it so abrasive, but
14 it was pretty much the same in its content.
15 Q. Is this letter purporting to explain why
16 you weren't obligated to file a 1040 tax return?
17 A. Yes.
18 Q. And you were relying on Mr. Champion's
19 advice on that issue?
20 A. Yes.
21 Q. The next document I want to show you is
22 similar. It's an E-mail cover, a cover E-mail and

**Page 78**

1  Q.  And he charged you for that service?
2  A.  Yes.
3  Q.  Look at the last invoice in the set, the
4  one numbered 1791.
5  A.  Okay.
6  Q.  All right. It's dated October 1, 2007.
7  Project, it says OCN letter. I'm not sure if it's
8  O-E or O-C. Can you explain what that is?
9  A.  That was a letter to my bank requesting
10 my records. I think it was the mortgage company.
11 They wanted my records.
12     So Dave Champion prepared a response to the
13 bank -- or not a response, but a letter to the bank
14 requesting that they not release my books and records
15 to them.
16 Q.  To the IRS?
17 A.  Yeah. To the IRS, and I don't believe
18 -- I don't know if they did or not.
19 Q.  Now, what happened ultimately with the
20 IRS's investigation of you that seemed to have
21 started in 2007? What was the result of that
22 investigation?

**Page 79**

1  A.  Oh, I mean, all I know is I was served
2  with papers to appear in court with my records before
3  a judge and I presented that -- what was it? A
4  subpoena? A summons? I presented that to Dave
5  Champion and he said I needed an attorney.
6  Q.  So did you hire an attorney?
7  A.  I hired an attorney.
8  Q.  Did you go to court?
9  A.  No. When I sought counsel, they said
10 that if I did not file tax returns, I would be
11 looking at some very serious charges. So I
12 immediately filed my tax returns and met with Thomas
13 Cheung.
14 Q.  When was this? When did you meet with
15 him?
16 A.  Gosh, I don't remember. I think we set
17 it up shortly after I was served with that summons.
18 Q.  Was it in 2007?
19 A.  I think it was probably 2008, I want to
20 say.
21 Q.  And what was the result of your meeting
22 with Mr. Cheung?

**Page 80**

1  A.  I had taxable income and filed my
2  returns immediately.
3  Q.  Were you found to owe any unpaid taxes
4  to the IRS, to the government?
5  A.  Yes.
6  Q.  What was the amount that you were found
7  to owe?
8  A.  I don't know exactly.
9  Q.  Was in excess of $10,000?
10 A.  I don't think it was in excess of that.
11 Maybe less than that. There was interest and
12 penalties and all that good stuff.
13 Q.  What was the total amount? Do you have
14 any recollection? If you include interest and
15 penalties, what was the total you owed to the
16 government?
17 A.  Oh, for all three years, added up
18 together?
19 Q.  Yeah, if you know.
20 A.  I don't know.
21 Q.  Was it a substantial amount in your
22 view?

**Page 81**

1  A.  To me it was, yeah.
2  Q.  Have you paid that sum?
3  A.  I'm working on it.
4  Q.  And you say that you filed returns for
5  the years that you hadn't filed?
6  A.  Yeah. As soon as my counsel advised me
7  that this would be -- I would be breaking the law if
8  I didn't, I immediately filed my returns.
9  Q.  And you filed 1040 returns since that
10 time?
11 A.  Oh, yeah.
12 Q.  And have you filed any returns for your
13 business or have you not needed to because you're a
14 sole proprietorship?
15 A.  My personal returns include a Schedule C
16 as a sole proprietor. So it's all intertwined
17 together.
18 Q.  Okay. Now, when was the last time you
19 paid David Champion for any of the services that you
20 testified to today, if you recall? We just looked at
21 some invoices where you paid him in 2007. Did you
22 pay him for any services after those dates?

**Page 82**

1    A.   When he told me I needed counsel, that
2  was pretty much the breaking point for me where it
3  was over. So if I paid him anything, it would have
4  been prior to that. I definitely did not pay him
5  anything after that point.
6    Q.   Do you remember when you had the
7  conversation with him when he told you you needed
8  counsel?
9    A.   Vaguely.
10   Q.   What year was it?
11   A.   It was -- all I know is it was the day
12 after I was served with those papers by Thomas
13 Cheung. He came to my office and delivered them to
14 me, and I believe I scanned them or E-mailed or faxed
15 them to David Champion, and the next day, we spoke
16 about -- you know, he read through it and said, Oh,
17 you need to speak with an attorney.
18   Q.   Is that all he told you?
19   A.   He had said -- let me see. He said
20 something about that if I didn't go to the meeting
21 with an attorney, I could be looking at some serious
22 charges as well and so could he. He didn't elaborate

**Page 83**

1  as to what they were. So that was the last advice I
2  followed from Champion and went and sought counsel.
3    Q.   After that date, did you have any more
4  interaction with Champion at all?
5    A.   I believe there was one exchange of a
6  voicemail message.
7    Q.   When was that?
8    A.   Shortly after -- right around the time I
9  was advised by counsel to severe all ties with Mr.
10 Champion. I called him to advise him of that. I
11 left him a voicemail message. He left me a message
12 back, and that was it.
13   Q.   You haven't had any conversations with
14 him of any kind since that date?
15   A.   None.
16   Q.   You haven't seen him in person since
17 that date?
18   A.   No. None, no.
19   Q.   Did you have any conversations with him
20 about your testimony today?
21   A.   No.
22   Q.   As you sit here today, are you happy

**Page 84**

1  with the services and advice you received from Mr.
2  Champion?
3    A.   No.
4    Q.   Why not?
5    A.   It cost me a lot more money in interest,
6  penalty, and legal fees and stress than it would have
7  cost me had I just filed the tax returns.
8    Q.   Do you hold him accountable at all for
9  the situation you found yourself in with the IRS?
10   A.   Well, I mean, I don't know how to answer
11 that. I mean, I'm a grown-up and I relied on his
12 advice and made decisions based on that advice. I
13 should have consulted some type of counsel and looked
14 a little further; but, I mean, I don't know how to
15 answer that question as far as holding him 100
16 percent accountable for it.
17   Q.   You did rely on his advice? Did I hear
18 you say that?
19   A.   Yes.
20   Q.   You assumed that what he told you was
21 true?
22   A.   Yes.

**Page 85**

1    Q.   Would you recommend that any other
2  individual retain him to get advice about being
3  non-taxpayers and their filing requirements?
4    A.   What was the question again?
5    Q.   Would you advise anyone else to seek
6  Champion's advice on matters of federal income
7  taxation?
8    A.   No. I would not advise anyone to follow
9  his advice.
10   Q.   Do you consider --
11   A.   Are you asking me would I recommend him
12 to anyone? No.
13   Q.   That's what I was asking.
14   A.   Okay.
15   Q.   As you sit here today, do you continue
16 to believe that Mr. Champion was correct in telling
17 you that you didn't have an obligation to file tax
18 returns?
19   A.   I wouldn't say it was correct. I mean,
20 I leave all the tax law stuff up to attorneys and
21 accountants. When they tell me it was wrong, I need
22 to file, then that's where I'm going.